UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JULIE A DODGHSON,

                Plaintiff,

     v.

NANCY BERRYHILL,

                Defendant.

Case No.  17-cv-02602-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 29

## INTRODUCTION

Plaintiff Julie A. Dodghson brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Nancy Berryhill, the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. PMSJ, Dkt. No. 18; DMSJ, Dkt. No. 21. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record (AR), and the relevant legal authority, the Court hereby **GRANTS** Plaintiff's motion and **DENIES** Defendant's cross-motion for the reasons set forth below.

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On October 25, 2013, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on January 20, 2013. The Social Security Administration (SSA) denied Plaintiff's claim initially and on reconsideration, finding that Plaintiff did not qualify for disability benefits. Plaintiff requested a hearing before an Administrative Law Judge (ALJ). ALJ Wynne O'Brien Persons conducted a hearing on June 4, 2015. Plaintiff testified in person at the hearing and was represented by counsel, William Tanoos. The ALJ also heard testimony from Vocational Expert (VE) David Dettmer.

United States District Court
Northern District of California

On September 4, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was

not disabled.  AR 23-32.

The regulations promulgated by the Commissioner of Social Security provide for a five-

step sequential analysis to determine whether a Social Security claimant is disabled.[1]  20 C.F.R. §

404.1520.  The sequential inquiry is terminated when "a question is answered affirmatively or

negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer

v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential

inquiry, the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r

Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the

Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v.

Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful

activity," which would mandate that the claimant be found not disabled regardless of medical

condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Here, the ALJ

determined that Plaintiff had not performed substantial gainful activity since January 20, 2013.

AR 25.

At step two, the ALJ must determine, based on medical findings, whether the claimant has

a "severe" impairment or combination of impairments as defined by the Social Security Act.  20

C.F.R. § 404.1520(a)(4)(ii).  If no severe impairment is found, the claimant is not disabled.  20

C.F.R. § 404.1520(c).  Here, the ALJ determined that Plaintiff had the following severe

impairments: bipolar disorder, major depressive disorder, post-traumatic stress disorder, attention

deficit hyperactivity disorder, and left carpal tunnel syndrome.  AR 25.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to

the third step, where the ALJ must determine whether the claimant has an impairment or

---

[1] Disability is "the inability to engage in any substantial gainful activity" because of a medical
impairment which can result in death or "which has lasted or can be expected to last for a
continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 26-27.

Before proceeding to step four, the ALJ must determine the claimant's Residual Function Capacity (RFC). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels, with non-exertional limitations: frequent left grasping, limited to one- to two- step tasks; of task 5% of workday; would be absent/tardy or need to leave early one time per month; no fast-pace production or assembly work; and need for low-stress work defined as work involving occasional decisions and changes. AR 27-30.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Here, the ALJ determined that Plaintiff could not perform past relevant work as secretary or typist. AR 30.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§

3

404.1520(g); 404.1560(c).  The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  Here, based on the VE's testimony, Plaintiff's age, education, work experience, and RFC, the ALJ determined Plaintiff could work as a hand packager, laundry worker, and scrap sorter, all occupations that exist in significant numbers in the national economy.  AR 30-31.

This decision became final when the Appeals Council declined to review it on March 6, 2017.  AR 1-4.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On November 20, 2017, Plaintiff filed the present Motion for Summary Judgment.  On March 20, 2018, after the parties stipulated to several extensions, Defendant filed a Cross-Motion for Summary Judgment.  Plaintiff filed her reply on April 10, 2018.  Dkt. No. 32.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ.  *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports

4

the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990). A court may not reverse an ALJ's decision on account of an error that is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## DISCUSSION

### A. Weighing Opinion of Treating Physician

#### 1. Legal Standard

"Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an opinion of a treating physician should be favored over that of a non-treating physician. *Id.* at 830-31. However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). The opinion of an examining physician generally is entitled to greater weight than the opinion of a non-examining physician, *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008), and the "opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician, *Lester*, 81 F.3d at 831. *See also* 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions.").

In order to reject the "uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). "If a treating or examining doctor's

5

opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than offer [] conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted). An ALJ errs when he or she does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, it is error for an ALJ not to offer a substantive basis before assigning little weight to the medical opinion. *See Id.* Generally, the SSA will give greater weight to an opinion that is more consistent with the record as a whole. 20 C.F.R. § 416.927(c)(4).

  2. <u>Dr. Michael Ciranni, Psy. D</u>.

   Dr. Ciranni began treating Plaintiff on November 22, 2011. AR 264. He noted a history of bipolar disorder and the fact Plaintiff was being seen by another treater for ongoing medication management. Dr. Ciranni prescribed a refill of Seroquel and scheduled a follow-up assessment. On December 2, 2011, Dr. Ciranni conducted a medication assessment. He noted Plaintiff's history of past psychiatric treatment, including: inpatient treatment once in the 1990s and once in 2003 for mania "in the absence of substance abuse," as well as continuous outpatient therapy beginning before 2003 and continuing through the date of the assessment. AR 267. Plaintiff had a more recent trauma in 2009 due to waking up next to her partner after he had died in his sleep due to sleep apnea; this manifests as feelings of panic, avoidance of sleeping, sleeping on an incline, difficulty sleeping, poor concentration, and exaggerated started response. *Id.* Plaintiff's prescriptions have included neuroleptics, mood stabilizers, antidepressants, anxiolytics, and psychostimulants. AR 267-69.

   Dr. Ciranni noted Plaintiff had some symptoms that may be congruent with Attention Deficit Hyperactivity Disorder (ADHD), including poor follow through on instructions, difficulty

organizing, easily distracted, forgetful in daily activities, as well as hyperactive symptoms of excess fidgeting, restlessness, talking excessively, blurting out answers, and problems with conversational turn-taking. AR 269. Dr. Ciranni opined that these "may have been contributing to impairment in occupational functioning, in terms of multiple job losses as office assistant, and do not seem to appear exclusively during manic episodes." *Id.* Plaintiff did not meet the full criteria for ADHD, and Dr. Ciranni noted there was some overlap of symptoms with her anxiety disorder. *Id.* He added a provisional diagnosis of ADHD NOS (not otherwise specified), in partial remission.

On January 20, 2012, Dr. Ciranni noted he had spoken with Plaintiff's counselor at the Marin Treatment Center (MTC), and learned of an incident where Plaintiff "appeared manic, [and] apparently threw a glass of water at someone, behavior that could have led to her being dismissed from MTC, except for her long history with them and known bipolar diagnosis." AR 278. When discussing the incident with Dr. Ciranni ten days later, Plaintiff acknowledged she did not react as well as she should have, and explained the atypical behavior was caused by stress due to having her car impounded. AR 281. Dr. Ciranni observed MTC's concern for her reflected her behavior that day represented a deviation from normal rather than her characteristic personality. AR 281.

On March 13, 2012, Dr. Ciranni noted that Plaintiff had gotten into an "interpersonal conflict" with one of her mother's friends after the friend criticized Plaintiff for coughing, and her mother uninvited her to gatherings of friends at her home as a result. AR 285.

On May 14, 2012, MTC contacted Dr. Ciranni again to inform him they had noticed Plaintiff getting more manic, "in context of missing does of Seroquel and decreasing Lithium dose." AR 291. At an appointment with Plaintiff the following day, Dr. Ciranni noted Plaintiff appeared "more pressured" and she reported having panic attacks after she moved her Seroquel dose to the afternoon; as a result, she started skipping Seroquel doses and decreasing her Lithium dose. Dr. Ciranni and Plaintiff agreed to restore her Lithium dose, replace Seroquel with Latuda, and add Ativan to help take the edge off if Plaintiff experienced a panic attack. *Id.*

Two weeks later, Dr. Ciranni adjusted Plaintiff's medication after she reported improved

control of her mania, but still had trouble sleeping and, according to her mother, showed

irritability. AR 294.

Dr. Ciranni reported on June 26, 2012 that Plaintiff was working with a job counselor for

employment options and hoped to rotate through an office internship for one week. AR 297. He

noted Plaintiff no longer wanted to apply for disability. On July 24, 2012, Plaintiff was still

excited about the job counseling program. AR 300.

On August 21, 2012, Plaintiff reported to Dr. Ciranni that she was having problems with

sustaining attention on boring or repetitive tasks, focusing on what others said, organizing,

managing her time, and losing things easily. AR 303. She reported that the Ritalin she had used

in the past may have been more helpful than she first thought. *Id.* Dr. Ciranni restarted Plaintiff

on Ritalin. *Id.*

On September 4, 2012, Plaintiff reported the Ritalin had been helpful and that she had been

more active in sending out resumes and working on her artwork. AR 306. However, she also had

trouble falling asleep at night, so Dr. Ciranni changed her Ritalin prescription to a sustained

release (SR) version. *Id.* Plaintiff continued to report positive effect of Ritalin two weeks later:

she started temping again, got a two-day job, and was able to extend her assignment due to good

performance; she was able to focus on work better and noticed improved concentration. AR 309.

On October 11, 2012, Plaintiff reported she was "overall doing pretty well, still temping

but hoping to land [a] full-time job again." AR 312. She was still experiencing irregular sleep,

and Dr. Ciranni prescribed two different forms of Ritalin (SR and regular release) so that Plaintiff

could compare their effects over the following month. *Id.*

On November 8, 2012, Plaintiff reported a chiropractor for whom she had been working as

a medical assistant had appeared paranoid and delusional; she also reported that she felt isolated

socially; she did not complain about her concentration, ability to work, or her medication regimen.

AR 315.

On December 18, 2012, Plaintiff reported she was "doing well" and "got long-term temp

job at Mighty Leaf tea, really enjoys work." AR 322. Although she had some problems with

8

1  oversleeping, she adjusted her schedule and "thinks she is doing well there." *Id.* She was sad the

2  assignment would end in mid-January but hoped to find work again soon. *Id.* Dr. Ciranni noted

3  Plaintiff showed no evident symptoms of mania, was tolerating her medication regimen well, and

4  liked Ritalin for ADHD management. *Id.*

5  On January 15, 2013, Plaintiff reported she was concerned about side effects she attributed

6  to Lithium; she thought it had interfered with her time management skills, causing her to show up

7  late to work or come back late from lunch, leading her to lose her job. AR 325. Dr. Ciranni

8  agreed to start tapering Lithium and agreed to review Plaintiff's short-term disability application.

9  *Id.*

10  On February 27, 2013, Plaintiff reported she was doing well on her current regimen and

11  was applying to get her Certified Nursing Assistant certification; Dr. Ciranni supported her

12  decision and offered to complete disability forms. AR 332. Three weeks later, Plaintiff indicated

13  she thought she was up for the harder task of getting certified as a medical assistant; Dr. Ciranni

14  thought she had the cognitive capacity to pursue this, but warned "it will be the attention to detail,

15  punctuality, [and] task monitoring that will be the biggest obstacle[s]." AR 335. Plaintiff thought

16  her mood was stable and her ADHD symptoms were controlled with Ritalin.

17  On April 10, 2013, Plaintiff was excited about the fact a home care agency opened an

18  office near her home and she wanted to get into this line of work. AR 338. Plaintiff continued to

19  tolerate her medication regimen well later that month, but requested a different Ritalin prescription

20  because of a price increase for the form she had been using. AR 342.

21  On May 9, 2013, Plaintiff reported to Dr. Ciranni that she was feeling more anxious and

22  had experienced a nightmare; this came in the context of her father pressuring her to get a job. AR

23  346. Plaintiff had received offers for three-day live-in home health positions, but declined the

24  offers because she was wary of taking these on as her first home health assignments. *Id.* Later

25  that month, she reported her panic attacks had subsided since switching back to Ritalin SR; she

26  also thought she could focus better. AR 353.

27  Plaintiff had been feeling depressed, but on June 5, 2013, Dr. Ciranni adjusted her

28

9

medications, which gave Plaintiff hope she would be able to look for a job again soon. AR 356.

Plaintiff reported being pleased with the current regimen on July 12, 2013. AR 364.

These positive feelings had evaporated by July 16, 2013. AR 365. Her job counselor told her to take computer training classes, but Plaintiff failed to attend them. *Id.* Dr. Ciranni adjusted her medications again. AR 365. When Plaintiff ran out of Ritalin, within one day she noticed a drop in her ability to concentrate and complete tasks. AR 369. She had a job interview that did not go well because she was having trouble moving effectively and was sweating profusely; her prospective employer was "unsympathetic." *Id.* Dr. Ciranni adjusted her medication regimen. *Id.* Plaintiff indicated she wanted to apply for disability, as she saw people in her AA group who received disability benefits even though their mental health problems were not as severe as hers. *Id.*

On September 12, 2013, Plaintiff reported she had started a new temp job and was feeling good about working; she still had problems with timeliness but could focus well at work. AR 374. Plaintiff was doing well on her medication regimen. *Id.* On October 8, 2013, Plaintiff reported she was still working full time at her temp job, was doing well, and thought her current combination of medication "is the best she's been on." AR 378. Plaintiff relayed this information by phone: she did not want to come in for an appointment because she did not want to jeopardize her job by taking time off. AR 378. The same thing occurred on November 7, 2013. AR 381. On November 19, 2013, Plaintiff reported that her job ended because the person she had been replacing had come back to work. AR 383. She reported she had applied for another job, but that it was harder to find administrative jobs over the holidays. *Id.* The current medication regimen was maintained. *Id.*

On December 12, 2013, Plaintiff reported she had a highly stressful job providing some sort of tech support for attorneys and had noticed symptoms suggesting a manic phase (increased impulsivity, difficulty sleeping, more distractibility, chronic problems with time management). AR 328. She ultimately lost the tech support job, and the temp agency dismissed her "as essentially unemployable because of poor performance with too many clients." *Id.* She was

thinking about applying for disability as a result. *Id.* Dr. Ciranni recommended restoring her Lithium dose, switching her Ritalin to sustained release, and reinstating Ativan for panic. *Id.*

On January 28, 2014, Plaintiff reported she had been feeling more depressed in the last few months. AR 457. She only had secured one short-lived temporary position, but she could not perform the job for ergonomic reasons and was let go because she was too qualified. *Id.* Plaintiff asked about going on disability, and Dr. Ciranni suggested she bring in the paperwork. *Id.* She complained of insomnia, concentration problems, and chronic problems with punctuality (Dr. Ciranni observed she was 20 minutes late to their appointment). *Id.* Dr. Ciranni adjusted her medications, but suggested holding all psychostimulants until they normalized her sleep patterns. *Id.* Without Ritalin, Plaintiff was able to sleep, however she reported difficulty concentrating, trouble getting organized, distractibility, and she wanted to switch back to a lower form or Ritalin. AR 596.

In February 2014, Dr. Ciranni and Plaintiff spent much of their session completing a medical assessment for disability; he documented ADHD and Bipolar I diagnoses as well as supporting symptoms that impair Plaintiff's ability to work effectively. AR 592. Plaintiff had been in a job retraining program; although she had begun an 8-hour a week job, she left after four sessions after being unable to get along with other employees. Her current medication regimen was maintained.

In March 2014, Plaintiff was working with an organization that provided tax help to seniors; Plaintiff passed a tax exam but was working as a receptionist. AR 585. Her medication regimen was maintained.

In April 2014, Plaintiff reported she was working for a non-profit as a marketer, developing a social media presence for the organization. AR 581. She reported increased lability: she found herself crying uncontrollably during a session and flew into a rage with a supervisor about a comparatively trivial issue. She asked for Ativan to handle the stress, and Dr. Ciranni agreed and also recommended upping her Lithium dose.

In May 2014, Plaintiff interviewed for another part time job. AR 553. She and Dr. Ciranni

continued to adjust her medications. *Id.* She reported her mood had stabilized the following

month. AR 571. She reported a manic phase had just ended on June 5, 2014, and Dr. Ciranni

observed she did not appear overtly manic during their appointment, aside from the leopard-print

stretch pants she was wearing. AR 575. They decided to continue with her existing medication

regimen. *Id.*

On September 30, 2014, Dr. Ciranni wrote the Marin County Department of Health and

Human Services (which oversees Plaintiff's methadone treatment), and explained Plaintiff "has

been suffering from depression that has been difficult to treat." AR 491. Plaintiff had been

responding to a recent combination of medications that caused side effects that complicated

Plaintiff's ability to provide required urine samples, but Dr. Ciranni was "reluctant" to change her

regimen "[g]iven the challenges we have faced thus far in finding effective treatment for her

depression." *Id.*

On October 28, 2014, Plaintiff arrived late to her appointment and conveyed she had been

getting a little manic: she got into an argument with her mother and threw a hamburger bun at her;

Dr. Ciranni did not observe her to be manic during their session. AR 549. Plaintiff told him she

was thinking she will apply for disability, as it was too hard for her to get work: "Can't maintain

focus at work, can't even apply for jobs for work, gets distracted too easily." *Id.* Dr. Ciranni

offered to help her complete the forms at their next appointment. He pointed out to Plaintiff that

her work history paradoxically works against her application.

On December 4, 2014, Plaintiff appeared for an appointment with disability forms

completed. AR 542. Dr. Ciranni noted she had prefilled a lot of symptoms, including many

symptoms of psychosis, which Dr. Ciranni did not find her to have. *Id.* He also explained that

eating junk food was not the same as an inability to feed herself, as an example of lacking

functional impairments in activities of daily living (ADLs). *Id.* He completed the form, noting the

legitimate problems Plaintiff experiences with work obligations and interpersonal interactions.

*Id.*; *see also* AR 503-506 (mental impairment questionnaire for Plaintiff signed by Dr. Ciranni on

December 4, 2014). On the form, Dr. Ciranni identified a dozen symptoms that Plaintiff had been

experiencing, but did not describe any clinical findings that demonstrated the severity of Plaintiff's symptoms. AR 504. He opined Plaintiff experienced slight limitations in her ADLs; marked limitations in maintaining social functioning; frequent deficiencies in concentration, persistence, or pace; and repeated episodes of deterioration or decompensation in work settings. AR 505. He expected Plaintiff would be absent more than three times a month due to her symptoms. AR 506.

Over the following six months, Dr. Ciranni and Plaintiff worked to adjust her medication regimen to address her depression. AR 508-541. On May 22, 2015, Dr. Ciranni summarized that Plaintiff's bipolar disorder has led to repeated loss of employment, while her depressed phase has led to an inability to manage ADLs at home effectively; she was late to her appointment that day. AR 508. Plaintiff and Dr. Ciranni continued to work on her medication regimen.

3.    ALJ Decision

The ALJ gave partial weight to the Dr. Ciranni's medical source statement. AR 27 (citing Exs. 3F, 5F, and 12F). She did so for several reasons.

First, "the record as a whole, including Dr. Ciranni's progress notes, do not support the level of dysfunction indicated." *Id.* at 27-28. Specifically, the ALJ noted that Dr. Ciranni assigned Plaintiff a Global Assessment of Functioning (GAF) score of 55 upon intake in 2011, which represents moderate symptoms. AR 28. The ALJ noted that Dr. Ciranni's notes did not show Plaintiff worsened in 2013, and that progress notes were relatively unchanged between intake and 2013. *Id.* The ALJ further observed that Plaintiff's purported disability was incompatible with her decision to apply to community college in February 2013, and Dr. Ciranni's support for that decision and offer to complete forms she might need to obtain accommodations. *Id.* (citing Ex. 3F/73-76).

Second, Dr. Ciranni's notes were "somewhat inconsistent but suggest that the primary reason that the claimant stopped working was because her job was a temporary job and her assignment ended." AR 28. When Plaintiff lost that job, she applied for disability. *Id.* (citing Ex. 3F/66).

13

Third, Dr. Ciranni's notes show Plaintiff's "alleged psychosis may actually be vivid dreams because she is 'not quite asleep' due to probable sleep apnea and/or fear or sleeping because her boyfriend died from sleep apnea." (citing Ex. 13F/19).

Fourth, Dr. Ciranni opined that Plaintiff's substance abuse may have contributed to her mood disturbances and/or that her mania improves when she follows treatment. In particular, Ritalin helps her functioning and enables her to search for a job and keep her house in order.

Fifth, Plaintiff exaggerated her symptoms when she pre-filled the disability paperwork she asked Dr. Ciranni to sign. Ex. 13F/20. Dr. Ciranni noted she had many legitimate problems, but was not psychotic at baseline.

Sixth, Plaintiff had no problems with her ADLs. 13F/35.

Seventh, Plaintiff had days where she was doing really well and functional. The examples of manic behavior she describes do not establish a significant level of impairment (e.g., wearing leopard pants). Dr. Ciranni's reports appear to be based on Plaintiff's self-reports upon intake in 2011.

Finally, Plaintiff was worried about losing medical insurance if she got a job, "which suggests that secondary gain may be a factor causing her to allege disability." AR 28.

### 4. Post-Hearing Evidence

After the ALJ issued her decision, Dr. Ciranni wrote a letter in support of Plaintiff's appeal. *See* AR 6, 8, 602-03. Dr. Ciranni wrote that the ALJ took his comments in his treatment notes "out of context." AR 602. In particular, Dr. Ciranni stated that Plaintiff experienced fluctuations in her symptoms, and that periods in which her symptoms seem to be improved did not actually reflect the overall trend of impairment in her symptoms that "render[] her in the main incapable of working." *Id.* Her work attempts have been "unsuccessful overall" and do not constitute evidence Plaintiff is capable of working. *Id.* Because Dr. Ciranni only sees Plaintiff "at a few discrete time points per month[,]" the fact he could not observe manic episodes during an appointment does not constitute that Plaintiff does not experience manic episodes: "[I]t is common for many patients to experience episodes that remit prior to the next scheduled session. The

comments made are indicators for where the patient is at the time on the spectrum between mania and depression and not intended to 'define' mania." *Id.* Dr. Ciranni also explains that he does not adjust the GAF score to reflect actual observed fluctuations in functioning, and notes the fact that "[i]t is precisely because many clinicians like me do not adjust this score that it has been removed as part of the multiaxial assessment format now used for the DSM-V." *Id.*

Ms. Julie Majdoubi, an MFT trainee, began treating Plaintiff on August 8, 2014. AR 600-01. She also submitted a letter in support of Plaintiff's appeal. AR 6. Ms. Majdoubi echoed Dr. Ciranni's opinion that Plaintiff was motivated to seek employment, but that "she had difficulty finding employment due to both her challenges related to her mental and physical conditions." AR 600. She further related that the facilitator of a job club for people with disabilities which Plaintiff attended expressed to Ms. Majdoubi and to Plaintiff "that she did not feel that [Plaintiff] was suited for job-seeking, nor did she feel that [Plaintiff] would be able to maintain employment after a potential hiring." *Id.* In particular, Ms. Majdoubi observed that Plaintiff had trouble with time management, organization, inattention, and social anxiety; and that she experienced profound short-term memory loss and severe fatigue, both of which limit her productivity and daily functioning. *Id.*

The Appeals Council reviewed the letters provided by Dr. Ciranni and Ms. Majdoubi, but concluded "this information does not provide a basis for changing the [ALJ's] decision." AR 2.[2]

5.   Analysis

The only medical source the ALJ identified to contradict the extent of the limitations Dr. Ciranni opined about were the State agency consultants who reviewed Plaintiff's case file and determined she had moderate limitations affecting her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule,

---

[2] The Appeals Council invited additional evidence, and accepted both Dr. Ciranno and Ms. Majdoubi's letters. Defendant's argument that this evidence should not be considered by this Court is not well taken. *See* DMSJ at 15. The Court also finds Defendant's argument that Dr. Ciranno, who treated Plaintiff for years, has agreed to become Plaintiff's advocate (*id.*) is without support. On the contrary, the record demonstrates that Dr. Ciranni declined to endorse exaggerated symptoms when Plaintiff presented him with pre-filled disability paperwork.

maintain regular attendance, be punctual within customary tolerances, and work in coordination

with or in proximity to others without being distracted by them.  AR 29.  Plaintiff was not

examined by a mental health consultative examiner.  The opinions of non-consultative examiners

cannot in and of themselves be used to contradict the opinion of a treating physician.  *See supra*.

The ALJ thus was required to identify clear and convincing reasons, based on substantial

evidence, for rejecting in part Dr. Ciranni's opinion.

Dr. Ciranni's opinions were based on his years of treating Plaintiff and her psychiatric

conditions, and observing her symptoms and the impact of those symptoms on her life, including

on the functional areas that are required for successful employment.  In evaluating Plaintiff's RFC,

the ALJ adopted limitations (such as being off task only 5% of the work day and absent or tardy

only once per month), that do not comport with Dr. Ciranni's opinions.  *See* AR 462 (frequent

deficiencies in concentration), AR 463 (absent more than three times per month).  The Court

concludes that Dr. Ciranni's letter explaining the ALJ's misinterpretation of his notes, the

extensive treatment notes summarized above, and Ms. Majdoubi's letter establish that the reasons

offered by the ALJ for rejecting Dr. Ciranni's testimony are not based on substantial evidence.  As

such, the undersigned finds the ALJ did not provide clear and convincing reasons, based on

substantial evidence, to reject Dr. Ciranni's opinions.

First, as Dr. Ciranni explained in his letter, the ALJ erred in rejecting Dr. Ciranni's opinion

regarding the impact of Plaintiff's mental health symptoms, whether caused by her Depression,

Bipolar Disorder, ADHD, Anxiety, or a combination of the three, by focusing on isolated

examples of wellness:

> Cycles of improvement and debilitating symptoms are a common
> occurrence, and in such circumstances it is error for an ALJ to pick
> out a few isolated instances of improvement over a period of months
> or years and to treat them as a basis for concluding a claimant is
> capable of working.  Reports of "improvement" in the context of
> mental health issues must be interpreted with an understanding of
> the patient's overall well-being and the nature of her symptoms.
> They must also be interpreted with an awareness that improved
> functioning while being treated and while limiting environmental
> stressors does not always mean that a claimant can function
> effectively in a workplace.  Caution in making such an inference is

16

especially appropriate when no doctor or other medical expert has opined, on the basis of a full review of all relevant records, that a mental health patient is capable of working or is prepared to return to work.

*Garrison v. Colvin*, 759 F.3d 995, 1017-18 (9th Cir. 2014) (internal citations omitted); *see also Attmore v. Colvin*, 827 F.3d 872, 877-78 (9th Cir. 2016) (ALJ erred by relying on examples that "were not in fact indicative of a 'broader development' in two respects. First, the improvement the ALJ highlighted was only temporary. It is the nature of bipolar disorder that symptoms wax and wane over time. With respect to such impairments, '[i]mprovement . . . that is only temporary will not warrant a finding of medical improvement.' Although the ALJ pointed to isolated signs of improvement, the ALJ could not find medical improvement on that basis unless the ups and the downs of [claimant's] development showed sustained improvement.") (internal citations omitted)). Dr. Ciranni's notes chart several years of his attempts to treat Plaintiff's mental health issues and his observation of the negative impact of those mental health issues on her ability to hold down work and relate to others. Dr. Ciranni's observations are supported by the experience of others who treated or attempted to employ Plaintiff. It was error for the ALJ to focus on isolated records that suggested Plaintiff's symptoms were improving, and to conclude based on those isolated records that she was not more than mildly impaired by her mental health conditions. As Dr. Ciranni makes plain in his letter, the fact he observed Plaintiff not being manic during a session did not indicate she had not been manic in between sessions. The reliance on Plaintiff's relatively unchanged GAF score is erroneous for the reasons explained in Dr. Ciranni's letter as well.

Second, the ALJ's statement that Plaintiff simply stopped working and applied for disability because one of her temp jobs "ended" mischaracterizes the record. The record establishes that Plaintiff repeatedly attempted to look for work and secured numerous temporary positions through an agency and a County rehabilitation program. The record also establishes that Plaintiff repeatedly engaged in conduct that either caused her to lose these jobs or would have caused her to lose jobs in the open market: she was repeatedly late; threw water at a counselor because she was stressed; flew into a rage with a supervisor; was unable to get along with co-workers; and lost so many temporary jobs that the placement agency with which she had worked

eventually refused to work with her again.  Although Plaintiff was able to work for up to several months when her medication regimen was effective, her treating psychiatrist, her counselor, and a counselor who specialized in securing employment for people with disabilities all opined that Plaintiff's mental health symptoms made her unsuited for regular employment.[3]  Moreover, the fact Plaintiff continued to attempt to work for time after applying for disability does not contradict Dr. Ciranni's opinions.  *Cf.* DMSJ at 14 (citing *Valentine v. Astrue*, 574 F.3d 685, 692-93 (9th Cir. 2009), for the proposition that Plaintiff being sad about her temporary job assignment ending contradicted Dr. Ciranni's opinion she could not work).

Third, although the ALJ identified Plaintiff's ADHD as a severe impairment (AR 25), she does not appear to have taken into consideration Plaintiff's ADHD symptoms when determining Plaintiff's RFC; she noted only that Ritalin helped Plaintiff focus (AR 27-30).  While there is evidence that Ritalin was effective in helping Plaintiff focus at times, there is no evidence the Ritalin helped Plaintiff focus sufficiently to work effectively on a regular basis at a job in the open market.  For example, even when she was using Ritalin, one employer fired her because she was repeatedly late, and a temp agency refused to work with her again because it found her "essentially unemployable."  *See supra*.  There also is no evidence Ritalin alleviated Plaintiff's other mental health symptoms, i.e., her mania.  On the contrary, the record establishes that Plaintiff had to taper or stop taking Ritalin entirely on various occasions because it exacerbated some symptoms of her bipolar disorder, including insomnia.  The ALJ found there appeared to be no medical cause for Plaintiff's chronic tardiness but in doing so ignored Dr. Ciranni's opinion that Plaintiff's lateness is caused by her mental health disorders.  It also is not clear what evidence the ALJ relied upon in concluding that Plaintiff's mood disturbances were caused by substance abuse during the time she has been a patient of Dr. Ciranni.

Fourth, the ALJ appears to have equated Plaintiff's ability and motivation to apply for

---

[3] While the ALJ need not defer to these sources on the ultimate issue of disability, the ALJ should have developed the record to determine the bases for Dr. Ciranni's opinions if he found them ambiguous.

jobs, college, or other certification programs, and Dr. Ciranni's support for these plans, as an indication Plaintiff could perform the work required to hold a job, graduate from college, or complete certification programs. Neither Plaintiff's optimism nor her treater's encouragement establishes Plaintiff was capable of doing so; in fact, there is no evidence in the record Plaintiff succeeded in her plans. Dr. Ciranni and Plaintiff agreed that Plaintiff felt better when she worked, and Plaintiff also was worried about finances. Her attempt to find work under these circumstances was not a clear and convincing reason to discount Dr. Ciranni's opinions. *See Lingenfelter*, 504 F.3d at 1036-37 ("[Claimant,] facing difficult economic circumstances, tried to work for nine weeks and, because of his impairments, failed[. This] is not a clear and convincing reason for concluding that his symptoms could not have precluded him from maintaining employment during the relevant time period."). Moreover, the ALJ's focus on Plaintiff's periods of relative well-being essentially ignores the nature of Plaintiff's Bipolar Disorder, "a disease that is, by definition, episodic." *Edler v. Astrue*, 391 F. App'x 599, 601 (9th Cir. 2010); *see also supra*.

Fifth, the State agency consultants to whose opinions the ALJ gave great weight only reviewed Plaintiff's records received through February 2014. *See* AR 75.[4] They therefore did not review many of the records summarized above, which described Dr. Ciranni's observations of Plaintiff for more than one year thereafter, including problems with punctuality, another phase of depression during which time period had difficulty with her ADLs, difficulties adjusting her medications, and Plaintiff's additional troubles maintaining employment due to her symptoms. They also did not review Dr. Ciranni's and Ms. Majdoubi's letters to the Appeals Council.

Sixth, the ALJ also cited the fact Plaintiff exaggerated her symptoms when she completed the disability paperwork on behalf of Dr. Ciranni, but did not analyze whether this was a symptom of Plaintiff's mental disorder. The ALJ did not acknowledge that Dr. Ciranni refused to endorse symptoms he did not find established, and only included in his questionnaire symptoms he believed were documented over his years of treating Plaintiff. In fact, Dr. Ciranni agrees with the

---

[4] Plaintiff meets the insured status requirements through September 30, 2018. AR 25.

ALJ that Plaintiff is not, at base, psychotic; the fact Plaintiff is not psychotic therefore does not constitute a clear and convincing reason to discount Dr. Ciranni's opinion.

Finally, the ALJ's suggestion that Plaintiff was motivated by secondary gain because she was worried about losing her health coverage is not based on substantial evidence; Plaintiff reported to her therapist that this one of the many current causes of stress in her life. This does not constitute substantial evidence for rejecting Dr. Ciranni's opinion.

The Court finds the ALJ did not articulate clear and convincing reasons for discounting Dr. Ciranni's opinions. Because the RFC the ALJ devised did not comport with the limitations Dr. Ciranni identified, the Court cannot find this error was harmless.

**B.      Plaintiff's Credibility**

"In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007; *see also Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."). "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036. Here, the ALJ found the objective medical evidence could reasonably be expected to produce the pain or other symptoms alleged, and did not identify any evidence of malingering. *See* AR 29-30. The ALJ thus was required to offer clear and convincing reasons for finding Plaintiff not entirely credible.

The ALJ found Plaintiff's statement regarding the intensity, persistence, and limiting effects of her mental health symptoms not entirely credible because: (1) prescribed medications reportedly improved her symptoms; (2) she has been able to work in the past despite her history of

20

treatment for mental impairments; (3) she stopped working because her temporary assignment ended; (4) there does not appear to be a medical basis for her tardiness; (5) her psychiatrist indicated her phobias are caused by sleep disturbances, and her mania only causes minor behavioral deviations; (6) Plaintiff exaggerated her symptoms when she pre-filled the disability paperwork she asked her doctor to sign; (7) she expressed concern that working could result in the loss of her medical insurance; (8) she and her doctor agreed she was capable of attending college with minimal accommodations; and (9) she had difficulty performing office work but had not attempted to perform unskilled work. AR 30.

These reasons are essentially identical to the reasons the ALJ offered for discounting Dr. Ciranni's opinions. The undersigned finds the ALJ erred in finding Plaintiff not entirely credible for the same reasons she found the ALJ erred in partially rejecting Dr. Ciranni's opinions.

**CONCLUSION**

In reviewing a Social Security Commissioner's decision, a court may remand the case "either for additional evidence and findings or to award benefits." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Typically, when a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Moreover, "[r]emand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (reversing and remanding for the consideration of new evidence instead of awarding benefits).

Plaintiff requests (PMSJ at 10), and the Court concludes, that this case should be remanded for further administrative proceedings so the ALJ can reevaluate Dr. Ciranni's opinion and Plaintiff's symptoms testimony. In order to do so, the ALJ may also decide to develop the record, and/or require additional VE testimony. Because the ALJ may conclude a different RFC applies and may require additional VE testimony, the Court will not address Plaintiff's argument that VE

21

Dettmer's testimony conflicted with the DOT at this point. However, if the ALJ applies the same RFC and concludes no additional VE testimony is required, the ALJ must confirm that the VE's interpretation of the RFC was correct.

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REVERSES** the ALJ's decision. This case is **REMANDED** for further administrative proceedings in accordance with this Order.

**IT IS SO ORDERED.**

Dated: May 2, 2018

_____
MARIA-ELENA JAMES
United States Magistrate Judge